*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 14, 2025
10:31 AM

Plaintiff-Appellee,

v

No. 365336
Genesee Circuit Court
LC No. 2019-044485-FC

JUSTIN MATTHEW JONES,

Defendant-Appellant.

Before: K. F. KELLY, P.J., and MARIANI and ACKERMAN, JJ.

PER CURIAM.

Defendant appeals by right his jury trial conviction for one count of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a) and (2)(b) (sexual contact with a victim less than 13 years of age by a defendant 17 years of age or older). The trial court sentenced defendant to 17 months to 15 years' imprisonment.[1] Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from an incident of sexual contact between defendant and the victim. The victim is the best friend of defendant's daughter, ZT. In November 2018, the victim stayed at defendant's home for the weekend to spend time with ZT. The victim testified that on Friday night, she was sitting on the couch watching a movie with defendant and ZT when defendant began to touch the victim's leg. The victim stated that defendant proceeded to digitally penetrate her, and forced her to touch his penis. She also testified that defendant sexually assaulted her the

---

[1] The jury also convicted defendant of one count of attempted CSC-II, MCL 750.520c(1)(a) and (2)(b) (sexual contact with a victim less than 13 years of age by a defendant 17 years of age or older). Defendant filed a postjudgment motion for a new trial, after which the trial court vacated his attempted CSC-II conviction and resentenced defendant on his remaining CSC-II conviction.

following day. The victim later disclosed the assaults to ZT and ZT's mother, who called the police.

Defendant was interviewed by Sergeant Brett Orvis on December 10, 2018. Prior to the interview, defendant was advised of, and waived, his *Miranda*[2] rights. In the interview, defendant maintained that no sexual contact occurred. Defendant was arrested following the interview. While in custody on December 11, 2018, defendant requested to take a polygraph examination. Chief of Police David Dwyre administered the examination. He advised defendant of his *Miranda* rights beforehand, and defendant signed three separate forms indicating that he waived his rights and consented to the polygraph. Dwyre questioned defendant based on the results of the polygraph, and defendant eventually admitted that the victim touched his bare penis. On December 12, 2018, Orvis asked defendant for consent to photograph his house. During this exchange, defendant told Orvis that he had taken "honey," a sexual stimulant, a few days before the incident. Orvis declined to speak with defendant further, since defendant had not been advised of his *Miranda* rights. On December 13, 2018, Orvis interviewed defendant again. Defendant waived his *Miranda* rights prior to the interview. In this final interview, defendant confessed that he took "honey" a few days before the incident, and that the victim grabbed his bare penis, but he pushed her away. Defendant denied sexually assaulting the victim.

At trial, the prosecution presented evidence of the foregoing statements. Defendant was convicted and sentenced as described. He now appeals, challenging the admissibility of his inculpatory statements and arguing that he was deprived of his right to the effective assistance of counsel.

## II. ADMISSIBILITY OF DEFENDANT'S STATEMENTS

Defendant argues that his inculpatory statements were obtained in violation of his due-process rights and privilege against self-incrimination. He challenges the admission of his inculpatory statements on four grounds, arguing that (1) his prepolygraph *Miranda* waiver on December 11, 2018, was involuntary, (2) his postpolygraph statements on December 11, 2018, were involuntarily coerced and the police failed to rewarn him of his *Miranda* rights, (3) the police failed to advise him of his *Miranda* rights before interrogating him on December 12, 2018, and (4) his *Miranda* waiver on December 13, 2018, was a product of the prior constitutional violations. We disagree as to each contention.

## A. STANDARDS OF REVIEW

"This Court generally reviews constitutional questions de novo." *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021) (quotation marks and citation omitted). We also review de novo questions of law, including whether a rule of evidence or statute precludes the admission of evidence. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). Generally, "[t]he decision whether to admit evidence is within the trial court's discretion, which will be reversed only where there is an abuse of discretion." *Id*. (citation omitted).

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

However, defendant failed to preserve his arguments regarding the admissibility of his inculpatory statements because he did not object to their admission at trial. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019) ("To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."). Although defendant claims he preserved the evidentiary issues by raising them in a motion for new trial, "a party asserting evidentiary error who fails to object at a time that gives the trial court the opportunity to correct the error does not preserve that evidentiary error by raising it for the first time in a postjudgment motion for a new trial." *People v Butsinas*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 364778); slip op at 10.

Unpreserved claims of error in a criminal case are reviewed for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Four requirements must be met to avoid forfeiture under the plain-error rule:

> 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) . . . the plain error affected substantial rights . . . [, and 4)] once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted; alterations in original).]

The third element "generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. (quotation marks and citation omitted).

## B. ANALYSIS

Defendant first argues that his December 11, 2018 waiver of his *Miranda* rights was involuntary because Dwyre made several statements that were coercive and deceptive while advising defendant of his rights.

The United States and Michigan Constitutions protect a defendant's right to due process of law and the privilege against self-incrimination. US Const, Ams V and XIV; Const 1963, art 1, § 17. To effectuate these rights, "custodial interrogation must be preceded by advice to the accused that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013) (quotation marks and citation omitted). To that end, "[s]tatements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *People v Barritt*, 325 Mich App 556, 561-562; 926 NW2d 811 (2018).

Determining the validity of a defendant's *Miranda* waiver requires courts to engage in a bifurcated analysis that considers "(1) whether the waiver was voluntary, and (2) whether the waiver was knowing and intelligent." *People v Eliason*, 300 Mich App 293, 304; 833 NW2d 357 (2013) (quotation marks and citations omitted). Whether a waiver is voluntary is assessed under

the totality of the circumstances, *id*. at 305, and "depends on the absence of police coercion; the defendant's waiver must be his or her own free and deliberate choice, rather than the product of intimidation," *id*. at 304 (quotation marks and citation omitted). On the other hand, "[w]hether a waiver is knowing and intelligent requires an inquiry into [a] defendant's level of understanding, irrespective of police conduct." *Id*. (quotation marks and citation omitted; second alteration in original).

Before beginning the polygraph examination, Dwyre asked defendant a series of questions regarding defendant's understanding of his rights and wrote down defendant's responses in a "participating-*Miranda* form." While asking defendant the participating-*Miranda* questions, Dwyre stated, "I don't have a dog in this fight. The police aren't paying me. The Genessee County Prosecutor's Office isn't paying me. You're not paying me. I'm here as a service, all right, for the State of Michigan, to come up here and trying [sic] to clear this mess up, okay?" Dwyre then stated, "If you have done nothing wrong, I want to be, I will be your advocate." After proceeding through the participating-*Miranda* questions, defendant signed a form that certified:

> I understood all of the above questions asked me. I have read everything on this page, including my truthful answers. I have been allowed to make any changes I wished to make. I wish to continue without an attorney. I am here of my own free will. I know I can leave this room by merely telling [Dwyre].

After obtaining the participating-*Miranda* form, Dwyre advised defendant of his *Miranda* rights verbatim. He presented defendant a waiver form, which included a section stating, "I've read the statement of my rights and I understand what my rights are. I'm willing to make a statement and answer questions. No promises, threats, pressure or coercion has been used against me." Dwyre confirmed with defendant that he knew what the term "coercion" meant, and defendant responded, "Mm-hmm," before signing the waiver form. Dwyre also had defendant read through and sign a permission form, which stated that his agreement to be interviewed was "voluntary—without threats, duress, coercion, [or] promises of immunity or reward." After obtaining these forms from defendant, Dwyre stated, "If for some reason I don't think [a] polygraph is going to help you, I'm not going to give you a test, okay? I'm only going to give it to you if I think it's going to help you."

Defendant contends that he did not intelligently waive his *Miranda* rights due to Dwyre's deceptive statements. We note that because defendant's challenge concerns Dwyre's conduct, his argument addresses the voluntariness of his waiver, rather than whether it was knowing or intelligent. See *Eliason*, 300 Mich App at 304. Regarding the propriety of Dwyre's statements, defendant argues that Dwyre's indication that he did not "have a dog in this fight" was a lie that deprived defendant of his knowledge and ability to understand his rights and the consequences of abandoning them. He also contends that Dwyre's statement that he would be defendant's "advocate" undermined defendant's understanding of his need for counsel. Finally, defendant maintains that Dwyre's statement that he would only administer defendant a polygraph if it was "going to help" constituted a false promise of exoneration.

While police conduct that is deceptive, deliberate, or reckless may impact the voluntariness of a *Miranda* waiver, "such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and

the consequences of abandoning them." *Moran v Burbine*, 475 US 412, 424; 106 S Ct 1135; 89 L Ed 2d 410 (1986). Defendant requested that the police conduct the polygraph examination and indicated that he was familiar with *Miranda* warnings because he had been advised of them in the past. Defendant was then presented with his rights three separate times, and waived them in three separate forms. A written waiver provides "strong evidence that the waiver was valid." *People v Cheatham*, 453 Mich 1, 31; 551 NW2d 355 (1996) (quotation marks and citation omitted). Even if Dwyre's statements during the participating-*Miranda* questions compromised the voluntariness of defendant's waiver, any issue was subsequently cured by Dwyre reading defendant the traditional *Miranda* warnings verbatim. Dwyre repeatedly confirmed with defendant that he was not coerced to participate in the interview, even pausing to determine if defendant knew what the word "coerced" meant. Under the totality of the circumstances, we conclude that defendant's waiver was valid and made of defendant's "own free and deliberate choice, rather than the product of intimidation." *Eliason*, 300 Mich App at 304 (quotation marks and citation omitted).

Defendant next argues that his inculpatory statement during the postpolygraph interview was involuntarily coerced and that he should have been issued renewed *Miranda* warnings after the polygraph examination concluded.

The Michigan Supreme Court addressed the necessity of renewed *Miranda* warnings following a polygraph examination in *People v Ray*, 431 Mich 260, 276; 430 NW2d 626 (1988):

> We conclude in the circumstances of this case that it was not necessary to rewarn the defendant of his constitutional rights in the limited exchange that ensued immediately after the polygraph machine was shut off. In *Wyrick v Fields*, 459 US 42, 47; 103 S Ct 394, 396; 74 L Ed 2d 214 (1982), the United States Supreme Court rejected the Eighth Circuit Court's holding that a failure to rewarn a suspect prior to the postpolygraph interview was a violation per se of his Fifth Amendment right to have counsel present at the interview. Recognizing that we are free to formulate another test, we adopt the *Wyrick* interpretation and hold that the admissibility of such statements is to be resolved by a review as to whether in the "totality of circumstances" the waiver of the Fifth Amendment right could be considered knowing and voluntary. [*Id.*]

"[U]nless the circumstances changed so seriously that his answers no longer were voluntary, or unless he no longer was making a knowing and intelligent relinquishment or abandonment of his rights," a defendant's prepolygraph waiver remains valid through the postpolygraph questioning. *Wyrick*, 459 US at 47 (quotation marks and citation omitted).

In this case, defendant requested the polygraph examination. He was provided his *Miranda* rights, both in the traditional format and in a participating-*Miranda* format. As discussed above, defendant knowingly, intelligently, and voluntarily waived his rights. Defendant then participated in the polygraph examination, which Dwyre testified took two hours in total, with the postexamination questioning taking up the last 20 minutes of the interview. The circumstances between defendant's valid waiver of his rights and the postpolygraph questioning did not change so seriously that his answers were no longer voluntary, see *Wyrick*, 459 US at 47, and Dwyre was not required "to rewarn the defendant of his constitutional rights in the limited exchange that ensued immediately after the polygraph," *Ray*, 431 Mich at 276.

Defendant otherwise maintains that his postpolygraph confession was inadmissible because his statement was involuntary and coerced. "The use of an involuntary statement elicited by coercive state action in a criminal trial violates" a defendant's right against self-incrimination and right to due process. *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023). "In other words, [i]f an individual's will was overborne or if his confession was not the product of a rational intellect and a free will, his confession is inadmissible because [it was] coerced." *Id.* (quotation marks and citations omitted; alterations in original). "Coercive tactics that can overbear an individual's will include both physical intimidation and psychological pressure." *Id.*

Defendant asserts that Dwyre's use of his polygraph results to obtain a confession was a coercive tactic, especially because Dwyre "emphasized the objective, truth-telling capacity of the machine." While Dwyre made comments about the functionality of the machine, when read in context, they were simply offered to provide defendant an explanation of how the machine worked. Before administering the polygraph, Dwyre told defendant that the machine primarily recorded blood pressure, which could indicate when an individual is lying, and stated, "It's not rocket science, it's just science. If this was rocket science, I couldn't do it." As for Dwyre's use of the polygraph results, Dwyre testified that he did not confront defendant about his polygraph results until the last 20 minutes of the interview. He also explained, "I didn't actually confront him at all and say, hey, I think you're lying. . . . I confronted him and told him that I believe that he had sexually assaulted the victim and that she had touched his penis and he started crying." We are not convinced that Dwyre's statements before and after the polygraph examination amounted to coercion such that defendant's will was overborne, nor does it appear that he was physically or psychologically pressured into making a confession. *Stewart*, 512 Mich at 480.

The circumstances surrounding defendant's postpolygraph confession also do not indicate that it was coerced. "To determine whether a statement was involuntary because of state coercion, a reviewing court must consider whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id.* at 481 (quotation marks and citation omitted). Factors for consideration include:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id.* (citation omitted).]

Defendant was 33 years old at the time of his arrest. While defendant argues that he lacked education because he "was a tow truck driver whose highest level of education was a GED," the evidence shows that he also had work experience as a fireman and a behavioral technician at a mental health facility. It does not appear that defendant's age or education level affected his ability to understand his rights. Further, as noted above, defendant had ample experience with the police, in both a casual and official capacity. Defendant stated that he had received *Miranda* warnings in

the past and that he was not scared of the police because he had "been friends with . . . the police for so long."

The factors relating to the length of defendant's questioning and detention also do not indicate that defendant's statement was involuntary. On December 10, 2018, Orvis interviewed defendant from about 5:00 p.m. to 9:00 p.m., after which he was arrested. Defendant then requested a polygraph examination, which took place the following day at about 9:30 a.m., and lasted about two hours. These circumstances do not indicate that defendant was subjected to repeated and prolonged questioning. Further, while defendant was in custody for four days before he saw a magistrate, it is possible the delay may have been a result of defendant's request for a polygraph. During his time in custody, defendant was repeatedly advised of his constitutional rights, which he repeatedly waived.

Regarding defendant's mental and physical condition, defendant stated that he had anxiety, bipolar disorder, and depression. However, it does not appear that defendant's mental-health issues prevented him from working or having partial custody of his daughter. While defendant produced an affidavit that he did not sleep well before the polygraph examination and did not have any food since the day before, Dwyre took several measures to ensure that defendant's physical and mental condition was suitable for the polygraph. Defendant also signed a permission form before the examination, indicating that he was "in good mental and physical condition," and that he was "well-treated." In sum, the foregoing factors do not suggest that defendant's postpolygraph statements were involuntary or the product of coercion.

Defendant next contends that his privilege against self-incrimination was violated because Orvis failed to advise defendant of his *Miranda* rights before he made inculpatory statements on December 12, 2018.

As noted above, questioning by police during a custodial interrogation implicates a defendant's privilege against self-incrimination and requires the police to advise a defendant of his or her *Miranda* rights. See *Cortez*, 299 Mich App at 691. There is no dispute that defendant was in custody when he made his December 12, 2018 statement. However, for the purposes of *Miranda*, defendant also had to be subject to interrogation, which refers to "express questioning and to any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *People v Raper*, 222 Mich App 475, 479; 563 NW2d 709 (1997). "Statements made voluntarily by persons in custody do not fall within the purview of *Miranda*." *Id*.

Orvis testified about the circumstances leading up to defendant's December 12, 2018 statement. Orvis stated that while he did not interview defendant on December 12, 2018, he went to see defendant at the jail to ask for consent to take pictures of his residence. During this exchange, which lasted 5 to 10 minutes, defendant attempted to talk to Orvis about taking "honey to impress another girl." Orvis stated that because he had not advised defendant of his *Miranda* rights, he "headed [the conversation] off" and told defendant he would interview him later. Orvis acknowledged that spontaneous offerings by a defendant do not require *Miranda* warnings, but he nonetheless preferred to conduct interviews at his office where he could use his recording equipment. Because defendant's statements to Orvis were spontaneous and voluntary, Orvis was not required to advise defendant of his *Miranda* rights. See *Raper*, 222 Mich App at 479.

Defendant argues that Orvis's testimony was unreliable and directly contradicted Orvis's statements during defendant's interview on December 13, 2018, where Orvis told defendant that Dwyre "confirmed what, what we talked about yesterday that—and that you admitted that [the victim] touched your bare skinned penis . . . ." Relying on this comment, defendant contends that his December 12, 2018 statement was the product of "a 20- to 30-minute interrogation," where Orvis "confronted [defendant] with the results of his polygraph examination . . . ." This contention is easily defeated when Orvis's statements and testimony are reviewed in context. While Orvis testified that he was at the jail for about 30 minutes on December 12, 2018, he clarified that his conversation with defendant lasted "five or ten minutes max." With regard to Orvis's statement that defendant "admitted that [the victim] touched [his] bare skinned penis," after he said this, Orvis immediately stated, "that was his, his words, not mine," likely referencing the fact that he got this information from Dwyre. The record does not suggest that this information was the product of an unwarned interrogation, and we conclude that defendant's December 12, 2018 statements to Orvis were properly admitted at trial.

Finally, defendant argues that his statements on December 13, 2018, were inadmissible because they were the product of his prior involuntary statements and elicited through an entire course of coercive police conduct.

On December 13, 2018, Orvis interviewed defendant a second time. Prior to the interview, he read defendant his *Miranda* rights, and defendant signed yet another waiver form. In this interview, defendant admitted that he ingested "honey" that was meant to "enhance performance" the Wednesday before the incident, and that the victim touched his bare penis. These statements were properly introduced at trial because they were preceded by defendant's knowing, intelligent, and voluntary waiver of his *Miranda* rights.

Nonetheless, defendant argues that his December 13, 2018 statements were the result of an entire course of allegedly coercive police conduct, and therefore inadmissible. He relies on *Oregon v Elstad*, 470 US 298; 105 S Ct 1285; 84 L Ed 2d 222 (1985) and *Missouri v Seibert*, 542 US 600; 124 S Ct 2601; 159 L Ed 2d 643 (2004) for the proposition that even if he waived his *Miranda* rights before making his December 13, 2018 statements, his statements were the product of his previous unwarned admissions and should have been suppressed. This argument is meritless because, as noted above, defendant's several waivers were valid and his inculpatory statements were voluntarily given.

For the foregoing reasons, defendant cannot establish plain error affecting his substantial rights because no constitutional or evidentiary errors occurred. See *Randolph*, 502 Mich at 10 (requiring a showing of error to prevail under the plain-error rule). Defendant's statements were properly admitted because he provided voluntary, knowing, and intelligent waivers of his *Miranda* rights when he was subject to custodial interrogation, and the evidence does not suggest that defendant's statements throughout the investigation were involuntary or coerced. Defendant failed to demonstrate plain error.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant lastly contends that his trial counsel was ineffective for failing to file a motion to suppress defendant's inculpatory statements based on the above claims of error. We disagree.

-8-

## A. STANDARDS OF REVIEW

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022) (quotation marks and citation omitted). "All findings of fact are reviewed for clear error, while the legal questions are reviewed de novo. When the reviewing court is left with a definite and firm conviction that the trial court made a mistake, there is clear error." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021) (quotation marks and citations omitted).

## B. ANALYSIS

"The United States and Michigan Constitutions protect a criminal defendant's right to a fair trial," which includes the right to receive effective assistance of counsel. *Isrow*, 339 Mich App at 531. See also US Const, Am VI; Const 1963, art 1, § 20. To succeed on a claim of ineffective assistance of counsel, "a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Ogilvie*, 341 Mich App at 34 (quotation marks and citations omitted).

As we thoroughly discussed above, defendant's claims of error are meritless. Defendant would not have prevailed on a motion to suppress at trial because his statements to law enforcement were properly admitted. "Counsel is not ineffective for failing to advance a meritless position or make a futile motion," and as such, defendant cannot succeed on his claim of ineffective assistance of counsel. *People v Henry (After Remand)*, 305 Mich App 127, 141; 854 NW2d 114 (2014).

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Philip P. Mariani
/s/ Matthew S. Ackerman